UNITED STATES v. MICHAEL et al.

No. 9473.

Circuit Court of Appeals
Third Circuit.

Argued Jan. 8, 1948.

Decided Aug. 13, 1948.

Rehearing Denied Oct. 13, 1948.

KALODNER, Circuit Judge, dissenting.

———o———

See also, 3 Cir., 162 F.2d 809.

Robert T. McCracken, of Philadelphia, Pa. (George G. Chandler, of Philadelphia, Pa., and J. Julius Levy, of Scranton, Pa., on the brief), for appellant.

Ben Brooks, Sp. Asst. to Atty. Gen. (T. Vincent Quinn, Asst. Atty. Gen., on the brief), for appellee.

Before MARIS, McLAUGHLIN, and KALODNER, Circuit Judges.

MARIS, Circuit Judge.

Homer N. Davis, George L. Fenner, Sr., Donald M. Johnson, Harry S. Knight and Robert Michael were indicted in the Middle District of Pennsylvania upon two counts charging the violation of Section 29, sub. a, of the Bankruptcy Act, 11 U.S.C.A. § 52, sub. a, and a third count charging a conspiracy to commit the violations set out in the previous counts. In the first two counts Michael was charged as principal and the other defendants as aiders and abettors. Michael pleaded guilty to all three counts of the indictment and after a trial in the district court Davis and Johnson were acquitted and Fenner and Knight were convicted upon all three counts. From the judgment of conviction Knight took the present appeal. On appeal his principal contention is that the testimony adduced at the trial did not support the charges made against him in the indictment and that accordingly it was error for the trial judge to deny his motion for a directed verdict of not guilty.

The case grew out of the reorganization of the Central Forging Company under Chapter X of the Bankruptcy Act. That company was engaged at Catawissa, Pennsylvania, in the manufacture of valves. A reorganization proceeding had been instituted in the District Court for the Middle District of Pennsylvania some time prior to January 1, 1942 and Walter H. Compton had been appointed trustee but the reorganization plan which he had formulated had been rejected by the creditors. On January 1, 1942 Compton resigned as trustee in order to accept appointment as referee in bankruptcy and defendant Michael succeeded him by appointment by Judge Johnson of the district court. By like appointment J. Donald Reifsnyder became the trustee's counsel. Reifsnyder was named in the indictment as a confederate but was not living when it was submitted.

Defendant Knight was special counsel for Maxi Manufacturing Company, a large user of the products of the Central Forging Company, whose officers had been operating the Forging Company's plant for both trustees. Early in 1942 Michael and Reifsnyder in consultation with Knight worked out a plan of reorganization which was subsequently approved by the creditors and by

1002

the court and carried out. Under this plan the Maxi Company acquired all the assets of the Forging Company, paid its secured creditors 20% and its unsecured creditors 5% of their claims in bonds subsequently paid off in cash and paid all the expenses of the reorganization proceeding and of a preceding receivership in the state court. Since the Forging Company was found by the court to be insolvent its stockholders were barred from any participation in its assets. Defendant Davis was secretary and treasurer of the Maxi Company and defendant Fenner was its general counsel.

The indictment in its first count charged that Michael unlawfully appropriated to his own use $3,000 belonging to the estate of the Central Forging Company which money had come into his charge as trustee. Specifically the count alleged:

"That the defendant Robert Michael, acting as Trustee * * * did arrange for the sale of all the assets of said Central Forging Company to the Maxi Manufacturing Company, under what was then designated a plan of reorganization, for an agreed amount; that the defendants and confederate herein did arrange that a part of the amount agreed upon as the purchase price of said assets, to wit, Three Thousand Dollars ($3,000.00) to be paid to * * * Michael, individually and not as Trustee * * * that the defendants * * * did pay to the defendant Robert Michael $3,-000.00 * * * that the defendants * * * did thereupon cause the accounts receivable in the assets of the estate * * * to be reduced in the valuation thereof by the sum of * * * $3,000.00 and did thereupon cause to be entered in the accounts of said estate the amount received from said Maxi Manufacturing Company for the estate of * * * Central Forging Company in a sum less by * * * $3,000.00 than had actually been paid therefor to the defendant * * * Michael, as Trustee; * * * Defendants * * * knowing that said * * * $3,000.00 was part of the purchase price then and there paid by * * * Maxi Manufacturing Company for the assets of the estate of * * *

Central Forging Company did aid, abet, counsel, induce and procure * * * Michael * * * not to deposit the same in the funds nor list the same in the accounts of the estate of said Central Forging Company and not to use the same for the benefit of said estate, but on the contrary to appropriate the same * * *."

The second count charged that Michael unlawfully transferred certain property of the estate of Central Forging Company, to wit: accounts receivable to the approximate value of $3,000. It alleged:

"That * * * Michael * * * did arrange for the transfer of the assets of said Central Forging Company to the Maxi Manufacturing Company under what was then designated a plan of reorganization for an amount which was agreed upon between them; that the defendants * * * did thereupon cause certain assets of said Central Forging Company to wit, accounts receivable, which had theretofore been valued at approximately $23,534.50, to be shown in the records of said estate to have a valuation of $20,534.50, then and there well knowing that the said Maxi Manufacturing Company was paying for said assets * * * an amount which included the accounts receivable at their value of $23,534.50, and did represent the amount received from said Maxi Manufacturing Company for said assets to be a sum less by * * * $3,000.00 than was actually being paid by said Maxi Manufacturing Company therefor and which was * * * $3,000.00 less than was actually being received by the defendant * * * Michael, as Trustee * * * that * * * defendants * * * did aid, abet, counsel, induce and procure * * * Michael to deprive said estate of the use and benefit of the * * * $3,000.00 * * * in that * * * Michael did transfer said assets to said Maxi Manufacturing Company without depositing in his funds as Trustee * * * the sum of * * * $3,000.00 * * * and thereby deprived the estate of the Central Forging Company of the benefit of the purchase price therefor to the extent of * * * $3,000.00 * * *."

The third count charged all the defendants with conspiring to commit the offenses set out in the first and second counts.

Defendant Donald M. Johnson is a son of a former judge of the district court. There was evidence that he had been instrumental in securing the appointment by his father of Michael and Reifsnyder as trustee and counsel respectively. The theory of the prosecution was that the sum of $3,000 which was charged as having been diverted from the estate had been paid over by Michael and Reifsnyder to defendant Johnson pursuant to a plan by which he was to share in their fees. The jury, however, acquitted Johnson, and the Government's theory as to the purpose of the transaction involving the $3,000 and the receipt of the money by Johnson, therefore, falls out of the case, leaving only the charge that Michael, for purposes of his own, appropriated $3,000 belonging to the estate and in that connection transferred $3,000 of accounts receivable without consideration being received therefor by the estate.

We turn then to the consideration of the facts established by the evidence in order to determine whether they furnish support for these charges. It appears that in January, 1942 Michael and Reifsnyder approached Knight as special counsel for the Maxi Company with the suggestion that a plan be worked out whereby the assets of the Forging Company be taken over by the Maxi Company upon terms satisfactory to the creditors. Following this conversation Knight on January 29th made a written offer on behalf of the Maxi Company to purchase the fixed assets of the Forging Company for $17,000 cash and to waive its claim as a secured creditor of the Forging Company. He calculated that under these circumstances the payment of the sum of $17,000 would be sufficient to pay the secured creditors of the Forging Company 20% and the unsecured creditors 5% on their claims. In his letter Knight suggested that the Forging Company's plant be kept operating and that its current assets be liquidated for an amount sufficient to pay expenses.

Further discussion arose between the parties as to whether the Maxi Company should take possession of the assets of the Forging Company as of the date when the final order approving the plan should be made or as of January 1, 1942. The parties had before them an accountant's report showing the assets and liabilities of the Forging Company of December 31, 1941. It was realized that the operation of the plant subsequent to that date had resulted and would continue to result in the use of current assets and their conversion into the form of finished products and new accounts receivable. Knight accordingly suggested that the Maxi Company should take over all the assets as of January 1, 1942, assuming the results of the trustee's operations during the intervening period and paying for the current assets thus taken over in addition to the sum of $17,000 agreed to be paid for the fixed assets.

After some further negotiations the parties reached an agreement upon a revised plan of reorganization under which the Forging Company was to be merged with the Maxi Company, all of its assets being transferred to the Maxi Company, its secured creditors were to receive 20% of the face amount of their claims in debenture bonds of the Maxi Company and its unsecured creditors were to receive 5% of the amount of their claims in similar bonds, such bonds aggregating $17,000. Under the plan the stockholders of the Forging Company were to receive nothing and the fees and expenses of the prior receivership in the state court and of the reorganization proceeding in the district court were to be paid in cash by the trustee. The trustee at the time did not have funds in his possession for this purpose and the plan did not specify the source from which he was to obtain the necessary funds. It is perfectly clear from the evidence, however, that it was understood by everyone that these funds were to come from the Maxi Company and it is equally clear that the Maxi Company's liability to pay to the trustee the moneys required by him for this purpose was limited to $26,404.33, which was the amount on December 31, 1941, as shown

by the accountant's report, of the net current assets of the Forging Company which the Maxi Company was to receive.

There was evidence which would support a finding that the Maxi Company obligated itself to pay $26,404.33, in addition to the $17,000 to which it was committed by the issuance of its debenture bonds in that amount to the Forging Company's creditors. The evidence, however, leaves no escape from the conclusion that the sum of $26,404.33 thus agreed to be paid was to be used only for the payment of expenses as allowed by the district court and that neither the creditors nor stockholders of the Forging Company had any interest in or claim upon that sum. The necessary conclusion, therefore, is that the Maxi Company's obligation under the plan was to pay $17,000 through its debenture bonds to the Forging Company's creditors and in addition to pay the expenses of the receivership and reorganization proceedings, as allowed by the District Court, to an amount not exceeding $26,404.33.

The plan of reorganization thus agreed upon was approved by the district court on March 16, 1942 for submission to the creditors. It was subsequently approved by the requisite majorities of the creditors and was finally confirmed by the district court on April 17th, and consummated on April 24th.

On April 8, 1942, Reifsnyder and Michael called upon Knight and informed him that they desired to secure $3,000 in addition to the allowances which the district court would make to them. It was suggested that this could be done by reducing by $3,000, in the report to be made by Michael to the court, the amount of accounts receivable shown in the net current assets of December 31, 1941 so that the latter would appear to amount to only $23,404.33 instead of the true figure as of that date, $26,404.33. It was evidently thought, and rightly so, as events turned out, that' the court would limit the allowances to the figure thus reported, in which case the Maxi Company would be able to pay Michael the $3,000 requested by him without exceeding the total amount which it had originally agreed

to pay. After some discussion and a conference by Knight with Davis, who was treasurer of the Maxi Company, that company agreed to make the payment as requested. It was also agreed that the check of the Maxi Company for this sum of $3,000 should be drawn to its general counsel Fenner who, deducting $500 to cover his estimated income tax thereon, would pay the remaining $2,500 over to Michael.

The plan thus agreed upon was carried out. Michael through his counsel Reifsnyder filed his report in the district court on April 14, 1942 showing net current assets of the Forging Company in the sum of $23,404.33. This was done by reducing the accounts receivable entering into the computation from $23,534.50 to $20,534.50. On April 20th Judge Johnson made an order allowing fees and expenses of the receivership annd reorganization proceeding which he stated "fully exhausts the fund of $23,404.33 available for fees, allowances and expenses as itemized in the report of the Trustee."

The reorganization plan having been confirmed by the court on April 17th, Fenner, Max Long, president of the Maxi Company, Davis, Reifsnyder, Michael and Knight met in Knight's office to consummate it. A bill of sale and a deed for the assets of the Forging Company were delivered to the Maxi Company. The debenture bonds of the Maxi Company in the face amount of $17,000 were delivered to Michael as trustee for delivery to the creditors of the Forging Company. The sum of $17,000 in cash was paid to an escrow agent for the redemption of the debentures. Checks were drawn by Davis, treasurer of the Maxi Company, and countersigned by Long, its president, for the fees and expenses as allowed by the court and finally a check for $3,000 was similarly drawn payable to Fenner as agreed upon. The parties then went to the Catawissa National Bank where Fenner endorsed the check and cashed it, retaining $500 and giving the remaining $2,500 to Michael.

The question for decision is whether these facts support the charges made in the indictment that Michael appropriated

to his own use $3,000 of funds belonging to the estate of the Forging Company and that in connection therewith he unlawfully transferred $3,000 of accounts receivable of the Forging Company to the Maxi Company. We think the answer must be in the negative. It is perfectly clear from the evidence that the defendants entered into a scheme to secure for Michael a payment of $3,000 to which he was not entitled under the plan or order of the court granting him allowances as trustee and this was accomplished by the use of devious means involving misleading the district court into thinking that the amount available for allowances under the plan was $3,000 less than in fact it was and the payment of the sum to Michael through an intermediary, Fenner, who was to pay income tax on it. The whole transaction was highly reprehensible and it may well have involved the commission of a criminal offense. Indeed under another indictment defendant Michael pleaded guilty to another charge growing out of these occurrences. The question before us, however, is not whether the defendant Knight committed any crime but only whether he aided and abetted Michael to violate Section 29, sub. a, in the manner described in the indictment.

The charge of the indictment is, as we have seen, based upon the premise that the sum of $3,000 which Michael received in the manner described belonged to the estate of the Forging Company. The facts, however, do not sustain this basic premise for it is perfectly clear from the undisputed evidence that no one other than the Maxi Company had any interest in the $3,000 which it paid to Michael through Fenner. For on April 8th, when the scheme to obtain the $3,000 was devised, the plan of reorganization had already been approved by the court and the creditors. The rights of the parties in interest in the estate of the Forging Company had thereby become fixed and established. Under the plan of reorganization, as we have said, the sole rights of the creditors were to receive the debenture bonds which the Maxi Company issued and which were delivered to them.

The stockholders had no rights whatever. The Maxi Company was entitled to all of the assets of the Forging Company and its only other obligation was to pay the expenses as allowed by the court. This obligation it fulfilled to the letter.

It is perfectly true that if the court had been informed that the net current assets amounted to $26,404.33 instead of only $23,404.33 it might well have awarded the larger sum instead of the smaller in the form of allowances. As we have said, it is perfectly clear that the defendants misled the court in this respect and well may have been guilty of a crime in so doing. But since the court did not in fact make allowances in excess of $23,404.33, the Maxi Company's obligation under the plan to pay the expenses was limited to that amount and its payment to Michael through Fenner of an additional $3,000 was a purely voluntary payment out of its own funds of a sum upon which the estate of the Forging Company had no claim.

What has been said applies equally to the charge in the second count of the indictment that $3,000 of accounts receivable were transferred without consideration. The fact is, as we have already pointed out, that the figure in question involved the amount of accounts receivable on December 31, 1941. There is evidence that most, if not all, of those accounts receivable were collected between December 31, 1941 and April 24, 1942 and there is no evidence as to the amount of accounts receivable actually transferred to the Maxi Company on the latter date. But whatever they were, the Maxi Company was entitled under the plan of reorganization to receive them and it did receive them along with all the other assets of the Forging Company. The sole consideration under the plan which the Maxi Company was obligated to pay for all of the assets of the Forging Company which it received, including the accounts receivable, was the issuance by it to the creditors of the Forging Company of its debenture bonds in the sum of $17,000 and its payment of the expenses of administration as allowed by the district court. We have seen that this considera-

tion was paid in full by the Maxi Company.

We, therefore, conclude that the evidence did not support the charges made in the indictment and that the district judge should have granted the motion of defendant Knight for a directed verdict. This conclusion makes it unnecessary for us to consider the other questions raised by the appellant.

The judgment of the district court will be reversed and the cause remanded with directions to enter a judgment of acquittal in favor of the appellant Knight.

KALODNER, Circuit Judge (dissenting).

The majority's position is that while the transaction under review "may well have involved the commission of a criminal offense" there was no crime committed within the purview of Section 29, sub. a, of the Bankruptcy Act.[1] Pointing out that under the plan of reorganization the stockholders had no rights whatever and that the creditors received all the benefits allotted to them by the reorganization plan and were not affected by the transaction in any respect, the majority takes the position that the $3,000 payment by the Maxi Company to the Trustee "was a purely voluntary payment out of its own funds of a sum *upon which the estate of the Forging Company (the bankrupt) had no claim.*" (emphasis supplied). In the latter state-

ment, in my view, lies the error of the majority.

The estate of the bankrupt was trust property. As such it was a distinct and separate res, corpus or entirety. It was a dynamic unit with established content. That it was so is evidenced by the provisions of the Bankruptcy Act, as amended by Section 1, sub. a, of the Act of June 22, 1938, c. 575, 11 U.S.C.A. § 110 sub. a, which, in providing that title to the property of the bankrupt shall "be vested by operation of law" in the trustee, designated the entrusted property as the "estate of a bankrupt".[2]

The continued existence of the estate of a bankrupt as a distinct and separate res, corpus, entirety or unit in bankruptcy is similar in every respect to that of the ordinary trust property. As under the law of trusts, the trustee of the bankrupt estate is under a duty to keep the trust property separate from his individual property, to see that it is designated as property of the trust, and to so treat it. Just as under the law of trusts, trust property is earmarked "property of the trust" in order to identify its separate existence, so has Congress designated the trust property here involved as the "estate of the bankrupt." Equity has long recognized the nature of a trust estate as an entirety and safeguarded its existence, as for example, by impressing with the trust property transferred by the trustee in violation of his

---

[1] Section 29 sub. a, of the Bankruptcy Act, as amended, 11 U.S.C.A. § 52 sub. a provides:

"a. A person shall be punished by imprisonment for a period of not to exceed five years or by a fine of not more than $5,000, or both, upon conviction of the offense of having knowingly and fraudulently appropriated to his own use, embezzled, spent, or unlawfully transferred any property or secreted or destroyed any document *belonging to the estate of a bankrupt* which came into his charge as trustee receiver, custodian, marshal, or other officer of the court." (Emphasis supplied)

[2] Subsection e(2) of Section 1 of the Act of June 22, 1938, 52 Stat. 879 refers to the *"estate"*; subsection f refers to "items of real and personal property belonging to the *bankrupt estate"*; sub-

section g refers to "the title to property of a *bankrupt estate.*" 11 U.S.C.A. § 110, subs. e(2), f, and g.

Section 2 of the Bankruptcy Act, as amended, 11 U.S.C.A. § 11, which provides for the "Creation of courts of bankruptcy and their jurisdiction", refers in subsection a(2) to *"bankrupt estates"*; subsection a(3) authorizes appointment of receivers, etc. *"to preserve the estate"*; subsection a(7) empowers the bankruptcy courts to "cause the *estates of bankrupts* to be collected," etc.; subsection a(8) empowers the bankruptcy courts to *"close estates"* and to *"reopen estates".*

Section 29, sub. a specifically prohibits the misappropriation of property *"belonging to the estate of a bankrupt."* See note 1, supra.

trust to a person who knows the circumstances even though he paid a consideration for the transfer. Restatement of the Law of Trusts, Section 288.

It was the duty of the trustee to preserve the bankrupt estate. The $23,534.50 of accounts receivable or the proceeds received in their collection constituted part and parcel of the estate of the bankrupt. It was the integrity of the estate which Section 29, sub. a, was designed to protect. When the arbitrary, unjustified and unexplained $3,000 reduction was made in the total of accounts receivable and the estate received $3,000 less as a result from the Maxi Company, and the Trustee was paid the $3,000 in consideration of that reduction, there was a misappropriation of the assets of the estate. The mere circumstance that the creditors and stockholders were not affected under the existing reorganization plan is entirely beside the point. The mere fact that there was no net change in the disbursements to any of the individuals concerned in the administration of the estate is also of no consequence. What is in point is that the bankrupt estate was defrauded of $3,000, which would otherwise have been available for distribution.

On January 1, 1942, when Michael took over as Trustee, the estate had accounts receivable of $23,534.50. In his April 14, 1942, report he falsified the amount of the accounts receivable, placing them at $20,534.50. No explanation of the reduction was attempted. There was no evidence of any actual shrinkage in the total of the accounts receivable as a result of uncollectibility. As a matter of fact, as pointed out in the majority opinion, there was evidence "that most, if not all of those accounts receivable were collected between December 31, 1941, and April 24, 1942."

The bankrupt estate was entitled to possession of the proceeds of whatever accounts receivable were collected, and if any of the latter remained uncollected, to the accounts themselves.

That the right of possession was violated with an attending fraudulent misappropriation within the meaning of Section 29, sub. a, as was found by the jury and the District Judge in denying the defendant's motion in arrest of judgment and for a new trial is crystal clear.

I can see no merit in the appellant's remaining contentions and for that reason would affirm.